IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

```
LISA JONES, et al.,              )
                                 )
            Plaintiffs,          )   No. 19-00102-CV-W-BP
                                 )   March 11, 2021
       V.                        )   Kansas City, Missouri
                                 )   CIVIL
MONSANTO COMPANY,                )
                                 )
            Defendant.           )
                                 )
```

TRANSCRIPT OF FINAL SETTLEMENT HEARING
(PARTIES APPEARING BY VIDEOCONFERENCE)


BEFORE THE HONORABLE BETH PHILLIPS
UNITED STATES DISTRICT JUDGE


Proceedings recorded by electronic stenography
Transcript produced by computer

Kathleen M. Wirt, RDR, CRR
United States Court Reporter
400 E. 9th Street, Suite 7452 * Kansas City, MO 64106

```
 1                    APPEARING BY VIDEO

 2
       For Plaintiffs:          MR. CLARK A. BINKLEY
 3                              Richman Law Group
                                81 Prospect Street
 4                              Brooklyn, NY 11201

 5                              MR. KIM E. RICHMAN
                                The Richman Law Group
 6                              8 W. 126th Street
                                New York, NY 10027
 7
                                MR. BRYCE B. BELL
 8                              Bell Law, LLC
                                2600 Grand Blvd., Suite 580
 9                              Kansas City, MO 64108

10     For Defendant:           MR. JOHN J. ROSENTHAL
                                MR. PATRICK E. HOGAN
11                              Winston & Strawn
                                1901 L Street NW
12                              Washington, DC 20036

13                              MR. JEFFREY WILKERSON
                                Winston & Strawn
14                              100 North Tryon Street, 29th Floor
                                Charlotte, NC 28202
15
                                MS. AMY CROUCH
16                              Shook, Hardy & Bacon, LLP
                                2555 Grand Boulevard
17                              Kansas City, MO 64108-2613

18     For Objector             MR. ADAM E. SCHULMAN
       Anna St. John:           Hamilton Lincoln Law Institute
19                              1629 K Street NW, Suite 300
                                Washington, DC 20006
20
                                MR. JONATHAN R. WHITEHEAD
21                              Law Offices of Jonathan R.
                                Whitehead, LLC
22                              229 SE Douglas, Suite 210
                                Lees Summit, MO 64063
23

24

25


                     Kathleen M. Wirt, RDR, CRR
                     United States Court Reporter
       400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
```

MARCH 11, 2021

- - -

1

2

3          (The following proceedings were had in the courtroom
4     with all parties appearing by video.)

5          THE COURT:  We're here today on Jones, et al. versus
6     Monsanto, et al., Case No. 19-102.

7          We're here today on a class action -- motion to
8     approve a class action settlement.  I know that you kind of
9     entered your appearance before I came in the room here, but for
10    my purposes, could the attorneys who are representing the
11    plaintiff and who intend to speak today enter your appearance
12    and let me know who I should refer to when having questions of
13    plaintiff?

14         MR. BINKLEY:  Good morning, Your Honor, this is
15    Clark Binkley for the plaintiffs.

16         MR. RICHMAN:  And Kim Richman assisting Mr. Binkley
17    today.  Good morning, Your Honor.

18         THE COURT:  Thank you.  And for defendants?  Who
19    will be primarily speaking behalf of defendants?

20         MR. ROSENTHAL:  Good morning, Your Honor.  It's John
21    Rosenthal from Winston & Strawn.  I'll be handling the
22    argument, but Mr. Wilkerson may be jumping in at moments where
23    I need help.

24         THE COURT:  Okay.  And for the objector,
25    Miss St. John?

1     MR. SCHULMAN:  Good morning, Your Honor.  Adam
2  Schulman for Objector St. John; and I have local counsel,
3  Jonathan Whitehead, with me.
4     THE COURT:  Okay.  Thank you.
5     Well, I have reviewed the various filings made by
6  the parties, including the response that was filed, response to
7  the objection that was filed earlier this morning.  As a
8  result, I have a few questions of counsel that will help the
9  decision that I'm going to be making in this case.  PI then
10  will open it up to any brief comments or arguments that any
11  counsel wishes to make.  In the interests of saving time, I
12  would ask that you not just restate the arguments in your
13  briefing.  I have read all of the briefing, and, after
14  receiving answers to some of the questions I have, we'll go
15  back and read the briefing again.  So I don't think that that
16  will be an efficient use of anyone's time.  But to the extent
17  any counsel wishes to either highlight one or two points
18  briefly or expand on some issue, I'll be open to hearing that
19  after I ask some of these questions.
20     So the first question I have is of plaintiff's
21  counsel, and that goes to the objection regarding the notice.
22  I know that in the affidavit, I believe, of Mr. Schwartz, you
23  indicate that the -- he states -- in Paragraph 27 of the most
24  recent exhibit that was dated February 25th, he states that the
25  reach of the notice was 80 percent with an average frequency of

1  2.28.

2      My question deals with -- and this may be somewhere

3  in the, all of the information that has been provided in this

4  case.  But my question is, No. 1, I think I know what is meant

5  by reach, but could you expand on what reach is or how reach is

6  defined?  I also think I know what average frequency is, but if

7  you could expand on that.  And if you could let me know what

8  the -- you believe the size of the class to be and, therefore,

9  what 80 percent means in terms of the -- if that's related to

10  the size of the class.

11      With that, Mr. Binkley?

12      MR. BINKLEY:  Thank you, Your Honor.  As I

13  understand it, frequency refers to the number of times that any

14  given class member will see an impression.  So the frequency as

15  to that, that we got in this case after running notice was that

16  each class member would have seen more than two impressions on

17  average.

18      Frequency is an estimate of -- sorry.  Reach is an

19  estimate of the percentage of the class that would have seen

20  any impressions across all different forms of the notice.

21      We do not have a set number for the class because

22  there is no -- there's no entity that tracks the exact number

23  of consumers who have purchased the products.  We had data on

24  how many products were purchased, and from that we were able to

25  extrapolate that the class does number in the millions, but we

1  cannot get an exact number for how many people purchased

2  because many people purchased more than a single product.

3          THE COURT:  So you do know that there were within

4  the appropriate time frame -- or relevant time frame that there

5  were millions of products sold?

6          MR. BINKLEY:  That's correct.  We do also know, I

7  should note, that the reach and frequency estimates translate

8  to hundreds of millions of impressions.

9          THE COURT:  And then the 242,000 valid claims, then,

10 is going to be a fairly small percentage of the entire class;

11 is that a fair statement?

12         MR. BINKLEY:  Based on revenue, we would estimate

13 that the claim share would be somewhere around 2 or 3 percent.

14         THE COURT:  Two or three percent?

15         MR. BINKLEY:  Which is in the typical range for

16 claims rates, yes.  Typically, we see claims rates of 1 to 5

17 percent in settlements regarding these types of retail false

18 advertising cases.  So that is within that range.

19         THE COURT:  So in light of the objector's objection,

20 have you done any additional investigation as to whether --

21 whether additional notice is possible, the cost of additional

22 notice, the reference that the objector makes to subpoenaing

23 records from big-box retail locations, actions or steps of that

24 sort?

25         MR. BINKLEY:  We have considered all of those

1  options, not just after seeing objections, but, of course,

2  earlier in this process.

3          As you know, Your Honor, we've revised the

4  settlement already.  The parties took very seriously their

5  concerns over how much of the distribution would end up in the

6  hands of consumers versus what was left over for cy pres.  And

7  after running the initial notice, even though it's already

8  exceeded reach and frequency targets and resulting in a claims

9  volume that was consistent with same and similar class action

10  settlements, we did revise the settlement itself and also the

11  notice plan, and we incorporated new forms of notice.

12          As we revised the original notice plan, one of the

13  things that we did was purchased a list of likely or possible

14  consumers of Roundup based on internet search history data, for

15  example.  This was an overinclusive list, this was very broad,

16  but we purchased this list and then contacted everyone on the

17  list directly.

18          And so this was already overinclusive, and in our

19  conversations with the claims administrator, we concluded that

20  this was actually more effective than seeking subpoenas from

21  retailers who have increasingly imperfect data.  Especially

22  with ongoing privacy concerns, retailers -- major retailers are

23  now getting rid of a lot of that data, they're not holding on

24  to it in the way that they used to.  They, of course, aren't

25  tracking people who make purchases with cash and, of course, it

1  would not include people who purchased from smaller retail

2  outlets.  So it was our conclusion that that would not have

3  been a most effective form of updating notice and that the

4  steps that we already took were, in fact, more effective.

5  THE COURT:  The next topic I have questions on is

6  the amount of damage that is -- that each class member

7  experienced and the conclusion that the loss was approximately

8  50 percent.  I think that these questions may be better

9  directed to counsel for Monsanto, but to the extent I'm

10  incorrect and, Mr. Binkley, you have an answer, feel free to

11  chime in.

12  Can you explain to me a little bit more as to how

13  the conclusion was drawn that the loss to each of -- each class

14  member was approximately 50 percent, as opposed to some higher

15  number?

16  MR. ROSENTHAL:  Yeah, if you don't mind, Clark, I'll

17  take that.

18  Good morning, Your Honor, it's John Rosenthal for

19  Monsanto.

20  We actually believe the actual damages are

21  substantially lower, if not nonexistent here.  The consumer

22  class case -- in consumer class cases, typically what's done or

23  what the plaintiffs originally in the context of the *Blitz*

24  case, which was the related case where they attempted to get

25  class certification and that was denied, they put forward an

expert that said that they would do a choice-based conjoint study.

There are criticisms about whether it's appropriate, but we took that and actually ran our own conjoint study for purposes of all the mediation here. And what that study does is essentially takes the product with and without the claim statement and tests that against consumers in a way so it can determine whether or not there's any price premium associated with the presence or absence of the statement.

And here, we retained the Analysis Group and Dr. Kristina Shampanier, who did the conjoint study and found that there was no statistical difference between the product with and without the challenge statement here. In other words, there's no damages.

Now, in the study, she went on to look at worst case scenario and said that worst case, worst case, even though there's no statistical relationship, the damages would be on the upward end of 2.5 percent of the overall purchase price of the product.

Now, plaintiffs, they did their own study in preparation for the mediation here, and they did not do a conjoint study, they'll be the first to admit that. They did more of a trademark survey study. Monsanto maintains that that study in and of itself would probably not be admissible in court, at the end of the day it wouldn't pass Daubert muster.

1    But with that qualification, they found that a range

2  of the price premiums here would be between 7.9 and 15.9

3  percent.  So we're at 2.5 in terms of -- well, we're actually

4  zero damages.  Worst case scenario, 2.5.  At the upper end,

5  plaintiffs are worth -- are at 15.

6    The original settlement agreement provided for that

7  the payment would be 10 percent of the weighted average retail

8  price.  And after notice and when the notice -- well, we came

9  back to Your Honor and said that we would like to put in an

10 escalator.  In other words, the parties still believe the

11 damages are, the actual damages are actually well below 10

12 percent, and Monsanto believes that we gave a multiple of

13 damages here, four times the actual worst case scenario

14 damages.  But the parties agreed they would escalate damages

15 based upon the claims of up to 50 percent, and that's how we

16 get to the 50 percent number.  So we don't -- I don't think

17 either party believes the 50 percent reflects actual damages.

18 They believe it reflects multiples of worst case scenario

19 actual damages that can be claimed at trial.

20    THE COURT:  Okay.  Thank you.  I think,

21 Mr. Rosenthal, you also may be the best person to ask the next

22 set of questions that I have, which goes to the declaratory

23 relief and the change in the label.

24    I'm interested in, just generally, as the objector

25 raises, whether or not the change in the label, the agreement

1  to change the label is an actual benefit to the class and to

2  the consumers, and I think some of the issues that may be

3  related to that are whether or not Monsanto intended to change

4  the label anyway before the lawsuit, if there are any labels

5  that are still in existence.  If you're still using the label,

6  for example, if you will require -- will submit the new label

7  for EPA approval, things of that sort.

8           So, Mr. Rosenthal, to the extent that you're the

9  most appropriate person to answer this question, can you

10  explain to me why Monsanto believes that this is an actual

11  benefit to the class?

12           MR. ROSENTHAL:  Yeah.  So unfortunately, I am the

13  person to answer that question.

14           I would say for us it's a double-edged sword.  We

15  don't believe the statement at the end of the day is

16  misleading.  We believe the statement has been approved for

17  over two decades by the EPA, and the EPA has never indicated in

18  any way, shape, or form that the statement rises to the level

19  of misbranding, in other words, it's misleading.

20           With that said, we do think anytime there's a

21  question where our customers or potential customers could

22  potentially be confused or raise a question and we can clarify

23  that, that's a benefit to consumers here.

24           And to that end, there was a parallel process here,

25  the parallel process being that there was a regulatory process

1 in which we were engaged in discussions with the EPA regarding

2 the statements and the change of that statement to drop the

3 people-and-pets language at the same time we were in

4 discussions with the plaintiffs.

5          So I would say it was a parallel process.  Certainly

6 plaintiffs' efforts contributed to that; but overall, the label

7 is controlled by the EPA, the EPA mandates the label here, and

8 any change has to be done with their approval, and we pursued

9 the approval process in parallel.

10          And the way this works is there's a master label for

11 each product, and we have to make an application for the master

12 label to make the change.  That process has started, and we

13 have already several labels that where the master label has

14 been changed, which then gives us a reasonable time period to

15 use the inventory to switch out to the new label, and then the

16 process of making this change with the additional labels is a

17 process that will take several more months because we're

18 talking about multiple packages here.

19          So the process is well on its way, but under the EPA

20 regs, we have a right to use the reasonable inventory, and we

21 have a reasonable period to change.  But at the end of the day,

22 I do believe that the class obviously helped with the movement

23 and the timing of this, but I would have to say it's a parallel

24 process, and ultimately, you know, the EPA has primary

25 jurisdiction here over the label, the contents of the label.

1        THE COURT:  Okay.  Thank you.

2        I need to go back to the notice issue, and,

3   Mr. Schulman, I forgot to ask you some questions on that issue.

4   Could you explain to me, given the extensive notice that was

5   done, given the -- what would expect to be the difficulty, what

6   I would expect to be a difficulty of getting specific consumer

7   information from big-box retailers, your position on what

8   additional notice should take place in this particular

9   settlement.

10        MR. SCHULMAN:  Well, I want to make clear that it

11   wasn't a notice, per se, objection that we were raising.  We

12   were raising that as an alternative possibility to get further

13   funds to the class, and, you know, we cited a number of cases

14   where that's used.

15        It's not always just used as a matter of sending

16   notice.  In fact, a lot of cases use that information that they

17   subpoena to send direct payments to the class member via Venmo

18   or PayPal or some other very cheap method of transmitting

19   electronic claims.

20        So once they have that information, they wouldn't --

21   they would already know that those class members are eligible

22   for claims.  There wouldn't be any need for them to go through

23   the claims process itself.  So I just wanted to make that

24   clear.

25        THE COURT:  Okay.

1          (Unintelligible cross-talking.)

2          THE COURT:  And with respect -- let me ask one

3     more -- let me ask one more question of Mr. Schulman.

4          Then on the damages, you don't have any evidence to

5     suggest that the damage to the class members was greater than

6     50 percent of the purchase product; is that an accurate

7     statement?

8          MR. SCHULMAN:  The problem with that is there was

9     no -- the only agreement that the price premium is a proper

10    measure of damages is an agreement that the parties came to at

11    settlement.  We quote from the relevant passages of the

12    complaint where the plaintiffs ask for full refunds because

13    they argue that they wouldn't be -- they wouldn't have

14    purchased the product otherwise.

15         And that has been -- there is a case out of the

16    Southern District of California last year that accepted that.

17    They don't need -- to get a full refund, it's not absolutely

18    necessary, according to this case, that you claim that the

19    product is valueless, just that you wouldn't have purchased it,

20    and they make those averments in their complaint.  And now

21    they're trying to have -- they're trying to settle on this

22    price premium method, but it's only for the purpose of

23    settlement.  It's not as if they lost the other measure at the

24    motion to dismiss stage or anything like that, and that's the

25    problem under *BankAmerica.  BankAmerica* doesn't allow the

1  settling party to do that.

2           THE COURT:  Okay.  Thank you.

3           I think someone tried to jump in.  Was it

4  Mr. Richman?

5           MR. ROSENTHAL:  No, it was Mr. Rosenthal.

6           THE COURT:  Oh, Mr. Rosenthal.

7           MR. ROSENTHAL:  I have a problem with jumping in.

8           A couple of things.  One, back to the notice.  And,

9  you know, as the Court is aware, the standard here isn't

10 perfect notice, the standard is reasonable notice here, and we

11 believe that the notice here has been more than reasonable when

12 you look at not just the notice plan, but there was an original

13 notice plan, there was a supplemental notice plan, there was an

14 updated notice plan, and when we changed those notice plans, we

15 came back to the Court to advise the Court what we were doing

16 here.

17          There's been an incredible -- you know, in terms of

18 the breadth and cost here of the notice plan, *Better Homes &*

19 *Gardens*, 431 million digital impressions, 80 million

20 impressions on digital ads, 7.2 million impressions via

21 streaming radio, sponsored search advertisements for 650,000

22 impressions, direct e-mail notices to 3.8 million people.  This

23 has really been quite the robust notice here.

24          Now, with respect to the retailers, could we go to

25 the retailers and subpoena them and get potentially some more

direct notice names?  Possibly.  I would tell you, the world
has really upended itself in the last year or two, particularly
with the California CCPA that now places all kinds of
limitations on what retailers can do with their customer data.
So retailers are very resistant to do that, and they're not --
many take the position they legally can't do that.  Obviously,
if they had a court order, that might change it.  But we don't
believe at the end of the day getting that will materially
change that.

        We have talked to P&N here, the administrator, and
we've asked them that question point blank over the last
several days, and their position is they do not believe that
the numbers would materially change.

        They did -- we did also ask them for an estimate if
we did that, assuming we could get the information, and, again,
they don't -- you know, based upon their experience, they're
not sure we could readily get that information, but they're
looking at an average cost here between 300 and $600,000, and
it's their view that that would not be worth the investment
because of the return there.

        The last point I would just make is moving to
*BankAmerica*.  I mean, we dispute strongly the objector, Miss
St. John's view of what *BankAmerica* says and does not say.  We
think the law is clear that you don't look at the total
purchase price in terms of whether somebody has been 100

1  percent compensated, you look at their reasonable claim of

2  damages; and the reasonable claim of damages, by any measure,

3  if you look at the current complaint, at the allegations in the

4  current complaint, it is some form of a price premium measure

5  here.  And, you know, I've already reviewed with the Court what

6  both parties' findings were, and here at 50 percent, we're at

7  multiples above a 100 percent claim of reasonable damages.

8           THE COURT:  So let me change subjects here to the

9  last topic that I have questions on, and that is the attorneys'

10 fees.

11          I do believe that it would be appropriate for me to

12 review the billing in this case and would ask that counsel

13 submit the billing in camera.  I think that raises another

14 issue, however, of the extent -- I know this was three

15 different cases originally that were combined into one for

16 purposes of settlement, and I'm open to suggestions.

17          My first thought is that the billing in this case

18 should be submitted separately, and then the billing for the

19 three combined cases, which I assume is going to be plaintiffs'

20 counsels' ultimate argument, should be submitted.

21          But does -- let's see, who is here on behalf of --

22 Mr. Binkley, do you have any thoughts on that?

23          MR. BINKLEY:  Yes, Your Honor.  We are, of course,

24 happy to submit records in camera for review.  We believe that

25 it is supported in the case law of this circuit that the

1  percentage-of-the-fund analysis is appropriate, with or without

2  any kind of lodestar cross-check; but if the court feels that

3  is appropriate to take a look at our time records in camera, we

4  certainly don't object to that.

5      Regarding the other cases, I believe this is all in

6  the moving papers so I won't belabor the point too much, but

7  significant work was done in the earlier cases.  That is where

8  most of the discovery was conducted, including the production

9  and review of thousands of documents and costly expert

10 discovery, and the parties agreed early on when this case was

11 filed to use that discovery in this case.  This case could not

12 have been litigated without that discovery, we could not have

13 mediated without having that discovery in hand, so it is

14 essential.

15      That said, we, of course, will submit the records

16 for each case, separated and delineated by case.

17      THE COURT:  Okay.  Thank you.  Do you think it's

18 reasonable to do that within the next seven days?

19      MR. BINKLEY:  I believe so, Your Honor.  Would

20 you -- would you be expecting anything beyond the time records

21 themselves?

22      THE COURT:  I'm sorry.  I didn't hear you.

23      MR. BINKLEY:  I'm sorry.  I was asking if you would

24 like a written submission beyond the time records themselves.

25      THE COURT:  I think at this point, the records

themselves would be sufficient.  I don't think that any type of
written submission would be necessary.

MR. BINKLEY:  Understood.

THE COURT:  Well, those are the questions that I
have.  I recognize that the parties have disputes regarding the
law that's applicable and the interpretation of the various
cases that were cited.  I will commend the parties, I think
that the briefing on these issues is very good, and I think I
understand the legal arguments that the parties are making.

But since we have a little bit of extra time,
Mr. Binkley, are there any issues that you would like me to --
or that you would like to discuss at this time?  Again, I'm
familiar with the briefing, but I will give you the opportunity
to make a brief argument, if you wish.

MR. BINKLEY:  Thank you, Your Honor.  First, I would
like to go back to the point about the value of the label
change to the class.  We think this is significant.  This is
beneficial to the entire class and to the general public.  It
is also something that goes beyond what was even available in
the best case scenario, had we litigated this case to its
completion.

As the Court is well aware, we have some issues that
would have precluded the parties who were seeking this as
actual relief in litigation, but we nevertheless entered into
settlement.  Monsanto maintained that there was a parallel

1  process here to change that label after the case had begun

2  before the settlement.

3         It's important to note that the settlement is

4  binding.  The settlement ties Monsanto to removal of this

5  label.  Absent the settlement, there would be nothing stopping

6  Monsanto from, perhaps, bringing it back another time.  It

7  would have to go through EPA approval, but this settlement

8  ensures for the class that that cannot happen.

9         So we do want to emphasize that that is of very real

10 value to the class.

11        THE COURT:  Okay.  Thank you very much.  And

12 Mr. Rosenthal, is there -- are there any points that you would

13 like to briefly raise?

14        MR. ROSENTHAL:  I would just like to point out, Your

15 Honor, I mean, this is a statement that has been on our labels

16 for quite some time, and it is a statement that was approved by

17 the EPA.  We don't believe that it is misleading.  It describes

18 how the products work and the product describes a metabolic

19 pathway that's in plants and some microorganisms, and it's not

20 in the human cellular or animal cellular structure.

21        You know, if this went forward, we think it's highly

22 unlikely that they would get any kind of a national class on

23 the merits.  They might be able to get some classes in

24 particular states, but there is substantial risk going forward;

25 and even if they can get a class, we have substantial defenses

1  on the merits, as well as this is not a good damage case for

2  the plaintiffs, and we don't have to speculate that because

3  we've already done the work here.

4  So when we look at the benefits here to the class,

5  there are substantial benefits to the class here, and this --

6  by any measure of a consumer class action, this is a fair and

7  reasonable settlement, and you just need to look at prior

8  Eighth Circuit precedent like the *Keil* case where they note

9  that, you know, claims raised in these kind of consumer class

10 actions are typically low, and they're on the order of 3

11 percent or lower.

12 I may have a comment or two after we hear from the

13 objector.

14 THE COURT:  Mr. Schulman, do you have any arguments

15 or brief issues you'd like to raise?

16 MR. SCHULMAN:  Thank you, Your Honor.

17 I'd like to address some of the things that were in

18 Monsanto's filing this morning, but before I do that, can I ask

19 if you'll allow us the opportunity to respond -- to address

20 plaintiffs' lodestar submissions?  I heard that you are

21 demanding -- or asking for them in camera, but we'd like the

22 opportunity to object to it, if you'll allow it.

23 THE COURT:  I'm not inclined -- I think that they

24 are attorney-client privileged materials, so I'm not inclined

25 to give you all of the billing records.  To the extent

1    Mr. Binkley -- well, to the extent, Mr. Schulman, you have some
2    suggestion as to how they could be provided in a way that
3    doesn't violate attorney-client privilege, I'm happy to hear
4    that argument.

5              MR. SCHULMAN:  Well, we certainly wouldn't object
6    to -- there's actually -- we've briefed this issue before.
7    There's certainly some allowance for minor redactions for
8    attorney-client confidences; but by and large, an adversary in
9    this type of situation, which we are since we're a class member
10   and they're seeking fees from the common fund, would be
11   entitled to review the majority that shows their entry, but --
12   or at least -- the very least, given that they're seeking a
13   percentage, there should be some lodestar summaries available
14   to class members who would like to object.

15             THE COURT:  Mr. Binkley, if you -- you know, I'm
16   sympathetic to the defendant's -- or to the objector's
17   arguments that they're entitled to some information.  As I've
18   mentioned, I'm also sympathetic to the argument that it's, as I
19   mentioned, attorney-client, but maybe even arguably more work
20   product.

21             So do you have any thoughts on how you could provide
22   the objector with information regarding the fees that would not
23   violate either of those or other privileges?

24             MR. BINKLEY:  Your Honor, I don't believe that this
25   would be appropriate, regardless of how we provide it.  This is

1  simply not necessary for the objector to see.  And the Eighth

2  Circuit has already established that a check of lodestar is

3  only necessary when there is actual reason to believe that the

4  fee award under a percentage-of-the-fund analysis would be

5  overly generous.  This is the *Petrovic v. Amoco Oil Company*

6  case from the Eighth Circuit.  While it is sometimes warranted

7  to double-check the percentage-of-the-fund method, it's not

8  necessary.  We think it's not necessary.

9          We think it's going far and above and beyond the

10  type of in camera double-checking that the Court is proposing

11  here to actually have this -- these time records analyzed by

12  the objector, and the objector has not actually raised any real

13  reason to doubt that our request for 25 percent of funds, which

14  I know is at the very bottom of the usual range in the Eighth

15  Circuit, they have not given any reason as to why that needs a

16  full cross-check.

17          THE COURT:  Well, I'll be honest.  I haven't had

18  this issue raised before me before.

19          So, Mr. Schulman, you mentioned that you had briefed

20  this issue in the past.  Why don't within the next seven days

21  you file a motion with your request; and, Mr. Binkley, if

22  within seven days of that motion you could respond, I will then

23  make a ruling as to the records that need to be supplied to the

24  objector.

25          Mr. Binkley, if in the meantime you could go ahead

1 and provide the records in camera, I think that would be
2 helpful to ensure the process moves forward, and then we will
3 at the same time determine what, if any, records Mr. Schulman
4 and his client are entitled to.

5        Mr. Schulman, in addition to the fee information,
6 were there other issues that you wanted to briefly discuss?

7        MR. SCHULMAN:  Thank you, Your Honor, yes.

8        So the bulk of the defendant's response I view to be
9 an interpretation of *BankAmerica* that is just belied by the
10 explicit text of *BankAmerica*.  It's not as if -- *BankAmerica* in
11 our view is crystal clear.  It doesn't just say once that you
12 may only find a windfall when -- to find a windfall, you must
13 find that class members with liquidated damages were 100
14 percent satisfied by the initial distribution, it also
15 reemphasizes that another time by separately saying it is not
16 true that class members with unliquidated damage claims in the
17 underlying litigation are, quote, unquote, fully compensated by
18 payments of the amount allocated to their claims in the
19 settlement.  And that's exactly what you have here.

20        So I don't think that -- you know, the language in
21 the text of *BankAmerica*, the holding, that's what binds this
22 Court, it's not that they cited an out-of-circuit case that
23 happened to allow an unliquidated damage claim and they found a
24 windfall in that case.

25        Monsanto also pointed to an earlier Eighth Circuit

case, *Powell v. Georgia*, which we didn't raise, but that case
was not about windfall whatsoever.  It was -- that case
permitted a residual to go to cy pres because it would be,
quote, extremely difficult to distribute the funds pro rata
because over a decade has elapsed since the initial
distribution.  It had nothing to do with how to evaluate
whether additional recovery would be a windfall.

        *BankAmerica* is the applicable precedent.  And that
wasn't changed by the *Rawa* case two years ago either because
that case -- in that case, the objector wasn't challenging the
underlying cy pres settlement, according to the Eighth Circuit
and according to the Eastern District of Missouri, it was
challenging the fact that the court didn't unilaterally shift
excess funds to the class rather than as the settlement
stipulated, and we concede that the court doesn't have that
unilateral authority, that the parties need to amend the
settlement to fix it.

        THE COURT:  Okay.  Thank you.

        (Audio distortion.)

        MR. SCHULMAN:  Those are the major issues.

        (Audio distortion.)

        THE COURT:  I'm sorry.  We didn't hear anything that
either of you just said.

        Mr. Schulman, did you have something that you were
saying?

1      MR. SCHULMAN:  I was just saying those were the
2  major issues.

3      The only other very small thing was that Monsanto in
4  a footnote said that removing the unit purchase caps would
5  encourage fraud, and I would refer Your Honor to the *Baby*
6  *Products* case in the Third Circuit that rejected that rationale
7  for preferring cy pres.

8      THE COURT:  Okay.  Mr. Rosenthal, did you have a
9  brief rebuttal that you wanted to make?

10      MR. ROSENTHAL:  Very brief.

11      First of all, I just have to look at the *Rawa* case
12  where we did experience substantial fraud, and that was noted
13  in the court and in the argument.

14      I would say going back to the other point, there can
15  be no fair reading in terms of what the plaintiffs are
16  suggesting *BankAmerica* says or doesn't say.  This issue was
17  directly at issue in the *Rawa* case.  I did an oral argument
18  before the Eighth Circuit.  The Eighth Circuit actually raised
19  this issue directly.

20      Now, why they didn't clarify it in their opinion,
21  what they did do is they approved a cy pres award in a case
22  that's not liquidated damages.  You can look at the history
23  here.  *BankAmerica* got the liquidated damages reference off the
24  *Klier* case.  The *Klier* case had multiple subclasses, which only
25  one of the subclasses had a claim for liquidated damages, and

that's where that was picked up, and then picked up again in
*BankAmerica*.

        But if you look at the decision before *BankAmerica*,
*Powell*, if you look at the decision after the *BankAmerica*,
*Rawa*, if you look at the other circuits that have spoken on
this issue, there's no limitations for liquidated damages.  And
indeed, it would not make any sense to limit cy pres awards to
contract cases, and it would not make the cy pres doctrine
available in other types of cases.  It just logically does not
make any sense.

        I would suggest that if the Eighth Circuit had an
issue or really thought that it's bound by plaintiffs' reading
of *BankAmerica*, then they would not have ruled the way they did
in the *Rawa* case.

        THE COURT:  Thank you.  I think that I have all of
the information I need.  I will await the briefing on the
sharing of the fee information with the objector, but at the
same time will do a cross-check on the fees myself.

        I will take this information, review all of the
briefing again and will take the matter under advisement, but
hope to get an order out in the somewhat near future.

        If there's nothing further, then thank you all for
coming in, and that will conclude this proceeding.

        MR. ROSENTHAL:  Thank you, Your Honor.

        MR. RICHMAN:  Thank you, Your Honor.

1          MR. SCHULMAN:   Thank you, Your Honor.

2          MR. WILKERSON:   Thank you, Your Honor.

3          (Hearing adjourned.)

4                              - - -

5                              - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>CERTIFICATE</u>

2              I certify that the foregoing transcript of

3   proceedings heard by the Court via videoconference is correct

4   to the best of my ability due to limitations of the technology

5   used.

6

7

8    March 15, 2021

9                              /s/_____
                               Kathleen M. Wirt, RDR, CRR
10                             U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25