## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

LISA JONES, *et al.*,                          )
                                               )
                          Plaintiffs,          )
            v.                                 )            No. 19-0102-CV-W-BP
                                               )
MONSANTO COMPANY,                              )
                                               )
                          Defendant.           )

## ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AND AWARD OF ATTORNEYS' FEES

On February 25, 2021, Plaintiffs filed a Motion for Final Approval of Class Settlement and Award of Attorneys' Fees, (Doc. 64). Objections were filed by one objector, Ms. Anna St. John, ("the Objector"). In accordance with the Court's Order and the Notice sent to class members, the Court conducted a hearing on March 11, 2021; counsel for the parties and the Objector were present, but no other objectors appeared. After considering the parties' and the Objector's arguments, the Court **GRANTS** Plaintiffs' motion to approve the settlement.

## I. BACKGROUND

Defendant manufactures various weed and grass killers under the name "Roundup." The active ingredient in these Roundup products is glyphosate, and the products contain a label, ("the Label"), stating that "[g]lyphosate targets an enzyme found in plants but not in people or pets." Beginning in 2015 several lawsuits were filed around the country alleging that the Label is false or misleading because, while the enzyme targeted by glyphosate is not used by vertebrates, it is used by helpful bacteria in the digestive system of vertebrates. Counsel for Plaintiffs in this case brought some of those suits, including in particular a case in the Western District of Wisconsin

captioned *Blitz v. Monsanto Co.,* Case No. 3:17-cv-00473.[1] That case involved consumers from six states, and initially sought to certify a nationwide class and subclasses for each of the six states where the plaintiffs resided. All the plaintiffs except for the Wisconsin consumer dismissed their claims without prejudice four months after *Blitz* was filed in light of the Supreme Court's intervening decision in *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017), which established that personal jurisdiction was lacking over the non-residents' claims. After significant discovery and work on pretrial motions, a motion was filed to certify a class of Wisconsin consumers; that motion was denied in January 2019 and the Seventh Circuit denied the plaintiff's request for interlocutory appeal.

Meanwhile, this case was filed in February 2019 by three plaintiffs asserting various claims arising from the Label's allegedly false or misleading representation. The suit was filed on behalf of the three plaintiffs and on behalf of (1) a putative nationwide class and (2) three putative subclasses for each of the states where the plaintiffs purchased Roundup.[2] Defendant filed a Motion to Dismiss, which included a request to dismiss the class certification allegations. Some of the issues raised were similar to those Defendant raised in *Blitz*; others were specifically related to New York and California law and had not been raised in *Blitz*. The motion was denied in its entirety in June 2019. (Doc. 41.)

In March 2020, Plaintiffs filed a Consent Motion seeking preliminary approval of a class action settlement. (Doc. 49.) The Court communicated some concerns to the parties, and, in response, the parties revised the settlement to provide:

---

[1] The Court takes judicial notice of the filings in *Blitz*.

[2] The named plaintiffs were citizens of Kansas, New York, and California, but the Kansas plaintiff purchased Roundup in Missouri, so the claims were based on Missouri, New York, and California law. There was no issue regarding personal jurisdiction because Defendant's headquarters are in Missouri.

2

1. Greater clarity with respect to the fact that personal injury claims were not released,

2. Specification of the amount of the incentive awards for the named Plaintiffs,

3. Specification of the *cy pres* recipients, and

4. Extensions to the deadlines for class members to submit claims and to opt out.

(Doc. 52.)

In May 2020, the Court preliminarily approved the settlement, ("the Original Settlement"). (Doc. 53.) The Original Settlement, (Doc. 52-1), proposed a class of all consumers in the country who purchased Roundup for personal use, with the statute of limitations varying from state to state. A settlement fund of $39.55 million was created, and class members would receive 10% of the average retail price for each product (with a cap of one purchase per year if proof of purchase was lacking). Fees for the claims administrator were predicted to range from $760,000 to $1.3 million, and a motion seeking attorney fees of up to 25% of the fund would be filed when final approval was sought. Each class representative would receive $2,500 as an incentive award. Any remaining funds would be distributed through a *cy pres* to the National Consumer Law Center and the National Advertising Division of the Better Business Bureau. The Original Settlement also required Defendant to change the Label. (Doc. 52-1, pp. 9-10.) Finally, the Original Settlement contemplated a notice plan employing a variety of communication avenues that was anticipated to reach at least 80% of the class members. (Doc. 50-5, ¶ 13.)[3]

Between May and September 2020, the parties employed additional notice measures not required by the Original Settlement. Most notably, they purchased email lists that enabled notices

---

[3] The notice plan utilized (1) print media, (2) digital banners on social media sites (*e.g.*, Facebook and Instagram), (3) streaming radio (*e.g.*, Pandora), (4) online video on YouTube, (5) search engine advertising, (6) press releases, (7) a settlement website, (8) a toll-free hotline, and (9) online displays/advertising on other websites. (Doc. 50-5, ¶¶ 12, 14-30.)

3

to be emailed to potential class members. Still, by September 2020, the total number of claims was approximately 150,000, which left a substantial amount of the settlement fund unclaimed. The parties expressed an interest in altering the settlement, and they eventually agreed to (1) increase the amounts paid to class members to 50% of the average retail price for each product, (2) extend the claims period, and (3) and pursue additional notice methods.[4] The parties also agreed to add the Center for Consumer Law & Economic Justice as an additional recipient of any *cy pres* distribution. (Doc. 58-1.) The Court approved the settlement as amended, ("the Updated Settlement"). (Doc. 59.)

On February 25, 2021 – and in advance of the final approval hearing set for March 11 – Plaintiffs filed a consent motion for final approval of the settlement. The parties reported that there have been approximately 240,000 valid claims, although the process for evaluating claims is ongoing. (Doc. 65-2, ¶¶ 21-22.) It is estimated that this constitutes between two to three percent of the potential class members, (Doc. 74, p. 6),[5] and it is estimated that more than 80% of the class members saw information about the settlement an average of more than two times each. (Doc. 65-2, ¶ 27; Doc. 74, p. 5.)

The total amount to be paid to the class will range (depending on the final count of valid claims) between $11.727 and $13.348 million. (Doc. 65-2, ¶¶ 21, 23.) The Class Administrator has incurred fees totaling $1,836,111. Class counsel seeks fees and costs in the amount of 25% of the settlement fund, or $9,887,500. And, the incentive awards for the three class representatives

---

[4] The additional notice methods are detailed and extensive and in light of the issues before the Court need not be summarized here. The important point is that they represented a substantial enhancement to the notification process contemplated by the Original Agreement. (*See* Doc. 58-2, ¶¶ 27-47.)

[5] All page numbers are those generated by the Court's CM/ECF system and may not correspond to the document's pagination.

will total $7,500.  This leaves (assuming the high end of the range for the amount paid to class members) more than $14.4 million to be distributed through the *cy pres.*

The Court has considered the parties' arguments (including the Objector's, most of which were already of concern to the Court).[6]  And, pursuant to its role as a guardian for the absent class members, *see In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005), the Court has considered other issues that have not been raised.  As discussed more fully below, the Court believes the settlement should be approved; during that discussion additional facts may be presented.

## II.  DISCUSSION

### A.  Requirements for Certification

A class can be certified if (1) the prerequisites in Rule 23(a) of the Federal Rules of Civil Procedure are satisfied and (2) the class qualifies under one of the provisions in Rule 23(b).  There is no dispute between the parties and the Objector – and little doubt in the Court's mind – that these requirements are satisfied, so only a brief discussion is necessary.

Rule 23(a)'s prerequisites are (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims of the parties are typical of the claims of the class, and (4) the class representatives (and their attorneys) will fairly and adequately represent the class.  There is no question that the first condition is satisfied.  The Label's contents and the scientific truth behind the representations are common questions of fact for all class members.  The fact that the Label is the same for all class members demonstrates that the class representatives' claims are typical of the claims of all class members.

---

[6] Therefore, there is no need to consider Defendant's suggestion that the Objector may lack standing.  (*See* Doc. 72, p. 2 & n.2.)

And, there is no question that the class representatives and class counsel can adequately represent the class.

The parties proposed certification under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods" for resolving the dispute. Most individual issues (*e.g.*, any issues related to reliance on the Label's representations) are rendered non-factors by the settlement's terms. The remaining significant individual issue – the amount of product bearing the Label each class member purchased – is resolved through the claims process and the Court finds that common issues predominate over the remaining individual issues. The Court also finds that this class action is superior to other methods of resolving the dispute, particularly given the small amounts of damage suffered by each consumer.

The Court also must consider the provisions of Rule 23(e)(2), which provides that a settlement binding absent class members can be approved only upon finding that the settlement is "fair, reasonable, and adequate" after considering several factors. Not all the factors are relevant in this case; those that are include whether the class has been adequately represented, whether the settlement was negotiated at arm's length, the costs, risks and delay of trial, the effectiveness of the claims process, and the attorney fees requested. The Court finds that these factors favor approval of the settlement. The settlement was achieved at arms-length after several sessions with a mediator, Professor Eric Green of Resolutions, LLC. (Doc. 50-1, ¶¶ 4-5; 58-1, p. 3.) The amount paid to class members is a reasonable settlement given the difficulties and risks of litigating the case to conclusion. The Court also notes that there has been only one objection filed, and even the Objector has not suggested that the amount of the settlement is inadequate or that the notice or the method of disseminating the notice was inadequate to satisfy the requirements of the Due Process

Clause or was otherwise infirm. The Objector argues that more should be done to identify class members and more should be paid to them, but she presents this argument as part of her larger arguments about the *cy pres* and the Court will discuss those issues when it discusses the *cy pres*. However, with respect to the Rule 23(e) factors, the Court finds that the process used to identify and pay class members and the amount paid to class members are fair and reasonable for settlement purposes.

## B.  Fairness of the Settlement

When reviewing a class action settlement, the Court must ensure that it is not the product of fraud or collusion and that it is fair, adequate, and reasonable. *Keil v. Lopez*, 862 F.3d 685, 693 (8th Cir. 2017). This requires the Court to consider (1) the merits of the plaintiff's case, weighed against the settlement's terms, (2) the defendant's financial condition, (3) the complexity and expense of further litigation, and (4) the amount of opposition to the settlement. *Id*. These factors favor approval.

With respect to the first and third factors: Plaintiffs' claims survived a Motion to Dismiss, (*see* Doc. 41). However, as is typical with claims of this sort, there would have been difficulties in establishing consumers relied on the Label or that Plaintiffs (or class members) would have paid less for Roundup or refused to buy it at all if the Label had been "more accurate." Further, the damages at stake for any Plaintiff or class member are relatively small, making extensive litigation a risky proposition. Finally, there is a unique obstacle in this case: the Label was approved by the Environmental Protection Agency, ("the EPA"), and by operation of law that approval is prima facie evidence that the Label complies with the disclosure requirements of the Federal Insecticide, Fungicide, and Rodenticide Act, ("FIFRA"). (*See* Doc. 41, p. 9-11 (discussing the effect of EPA approval generally and 7 U.S.C. § 136a(f)(2) specifically).) Given these facts, the opportunity

provided by the settlement for class members to recover 50% of the price they paid was more than reasonable. In addition, the settlement provides prospective/injunctive relief in that it requires Defendant to change the Label. The value and significance of this component of the settlement will be discussed in greater detail in Part II.D of this Order; for present, it is enough to observe that the Court finds it to be worthy of consideration when evaluating the settlement's benefits.

There is no question regarding Defendant's ability to fund the settlement. Similarly, there has been only one objection – and even the Objector does not contend that the settlement's terms are unfair, inadequate, or should not be approved based on the factors identified in *Keil*. Therefore, the Court finds that the settlement is fair, adequate, and reasonable.

## C. The *Cy Pres* Award

The cy pres award in this case is large, not only in magnitude but in terms of the percentage of the settlement fund. However, after reviewing the law governing *cy pres* awards, the Court exercises it discretion to approve it in this case. In so doing, the Court overrules the Objector's arguments regarding the propriety of a *cy pres* and its more specific challenges to the recipients of the funds.

### *1. Propriety of a Cy Pres*

The *cy pres* doctrine takes its name from the Norman French expression, *cy pres comme possible,* which means "as near as possible." The doctrine originated to save testamentary charitable gifts that would otherwise fail. Under *cy pres,* if the testator had a general charitable intent, the court will look for an alternate recipient that will best serve the gift's original purpose. In the class action context, it may be appropriate for a court to use *cy pres* principles to distribute unclaimed funds. In such a case, the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated.

*In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682-83 (8th Cir. 2002) (quotations and citations omitted). However, in the class action context, "[b]ecause the settlement funds are the

property of the class, a *cy pres* distribution to a third party of unclaimed settlement funds is permissible *only* when it is not feasible to make further distributions to class members except where an additional distribution would provide a windfall to class members with *liquidated*-damages claims that were 100 percent satisfied by the initial distribution." *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1064 (8th Cir. 2015) (cleaned up; emphasis in original) (hereafter "*BankAmerica*"). This raises two consideration: (1) whether it is feasible or appropriate to employ more efforts to identify class members or increase the claims rate, and (2) whether more money should be distributed to the class members who have submitted valid claims.

The Court finds that further efforts to identify class members or increase the claims rate is not feasible. As noted, more than 80% of the class members have been notified of the settlement, and the Court has not been presented with reason to think there are feasible or cost-effective means of increasing the efficacy of notice or of increasing the response rate. The Objector suggested the possibility of subpoenaing "the records of big-box retailers for the purpose of remitting direct distributions to class members," (Doc. 71, p. 15), but Class Counsel explained that pursuing information from retailers was unlikely to be effective (much less cost-effective) given (1) privacy restrictions placed on retailers, (2) the inability to track customers who paid with cash, and (3) the numerous "smaller retail outlets" that sold products bearing the Label. (Doc. 74, pp. 7-8, 15-16.) The Court further reiterates that the Objector is not contending that the notice plan was inadequate or violated Due Process but is merely suggesting subpoenaing large retailers as a means of increasing the "amount of notice" further. (Doc. 74, p. 13.) However, the Objector has presented nothing to counter Class Counsel's explanation or to otherwise demonstrate that the efforts she

proposed would increase the percentage of class members aware of the settlement or otherwise increase the claims rate.[7]

The Objector's primary argument is that more money should be distributed to the class members, and if the parties are unwilling to distribute more money the settlement should not be approved.[8]  While the class members received 50% of the amount they paid for Roundup, she contends they must receive 100% of the amount they paid before any money can be distributed through the *cy pres*.  For support, she points to the Eighth Circuit's statement in *In re BankAmerica Corp.* that an additional distribution need not be made if doing so "would provide a windfall to class members with *liquidated*-damages claims that were 100 percent satisfied by the initial distribution."  *BankAmerica*, 775 F.3d at 1064 (8th Cir. 2015) (quotation omitted; emphasis in original).  She relies on this passage to argue that additional payments to class members are a windfall only when the class is recovering liquidated damages and the class members have received 100% of those liquidated damages.

The Court does not agree.  First, *BankAmerica* does not limit use of a *cy pres* to cases in which the damages are unliquidated.  The holdings of the case are that if funds can be feasibly distributed to claimants, (1) a *cy pres* distribution is not permissible unless the claimants have been given full compensation and (2) when damages are liquidated, full compensation is necessarily

---

[7] The Court further notes that the Objector's anecdotal examples of additional notice measures appear distinguishable. (*See* Doc. 71, pp. 15-16.)  Moreover, in two of those instances the third-party subpoena was issued (to Amazon) as part of the initial process of identifying class members.  Here, issuing third-party subpoenas is suggested as a method to augment the measures already employed; undoubtedly, any information obtained from big box retailers would be substantially duplicative of the information already obtained.  The Objector has not established that the effort would provide contact information for substantially more class members or be worth the resources necessary to complete the effort.  Similarly, the Objector's third example (which involved obtaining information regarding Target's and Safeway's loyalty card members) provides no indication quantifying the benefit of that endeavor.

[8] The Court cannot rewrite the settlement to require that more funds be distributed.  *See Rawa v. Monsanto Co.*, 934 F.3d 862, 871 (8th Cir. 2019).  The Court's only choices are to approve or reject the settlement.

100% of those damages. *BankAmerica* discussed a rule for liquidated damages because the damages in that case were liquidated: the damages were the $5.87 drop in stock price and a settlement paying less than that amount was not 100% payment. *BankAmerica*, 775 F.3d at 1066. Because the case before it involved liquidated damages, the Eighth Circuit had no reason to address cases where damages are unliquidated, or to specify what constitutes "full compensation" in cases where the damages are unliquidated. Thus, interpreting *BankAmerica* as effectively limiting use of a *cy pres* to instances where damages are liquidated seems unduly restrictive and contrary to the Eighth Circuit's intent. Second, the Fifth Circuit case relied on in *BankAmerica* made the point that "[a] party whose liquidated-damages claim has been fully satisfied cannot make a persuasive equitable claim to any residual settlement funds." *Klier v. Elf Atochem N. Am.*, 658 F.3d 468, 475 n. 17 (5th Cir. 2011). This does not mean that a party who has received payment on an unliquidated claim cannot also lack a persuasive equitable claim to residual settlement funds. Finally, following *BankAmerica* the Eighth Circuit has approved *cy pres* distributions in cases where the claimants' damages were unliquidated without requiring additional distributions to the class members. *E.g., Rawa v. Monsanto Co.*, 934 F.3d 862, 871 (8th Cir. 2019).[9]

Thus, the question before the Court is: have the claimants been fully compensated, such that they do not have an equitable claim to the remaining funds? If they have not, the Court must decline to approve the settlement; if they have, then a *cy pres* is appropriate. The Court concludes that 50% of the purchase price constituted at least full (if not more) compensation for the class members' damages. In reaching this conclusion the Court does not consider or rely on the fact

---

[9] The Objector contends that *Rawa* is not relevant because in that case the Eighth Circuit characterized the objector as asking the court to "redraft" the agreement to pay more to claimants and did not ask that the settlement be rejected. (*E.g.*, Doc. 74, p. 25.) However, even if the objector in *Rawa* did not seek the correct remedy, the argument was still presented that the excess funds should not be distributed to the *cy pres* – and the Eighth Circuit apparently did not agree with this argument. The Court further takes judicial notice that *BankAmerica* was discussed in the briefs filed in *Rawa* and the propriety of approving the *cy pres* was discussed at oral argument.

that the claimants received the amount agreed to in the Updated Settlement. *BankAmerica*, 775 F.3d at 1065-66. Instead, the Court reaches this conclusion after considering the claims at issue and the evidence and arguments presented.

The Complaint asserts claims for violations of consumer protection laws regarding fraud and misrepresentation, breach of express warranty, and unjust enrichment. The measure of damages for all these claims requires consideration of the fact that the consumers received and used Roundup; that is, they received some value from their purchase. Thus, even if they were to contend they would not have purchased Roundup absent the label's representations, the class members' damages would not be 100% of the purchase price because the value they received from using Roundup would have to be accounted for in the damage calculation. For instance:[10]

- In *Myers-Amstrong v. Actavis Totowa, LLC*, 2009 WL 1082026, at *4 (N.D. Cal. April 22, 2009), the plaintiff purchased and used an allegedly adulterated drug but suffered no ill effects from its use and did not allege that the product did not work. The district court held the plaintiff could not establish claims under California law for breach of warranty, fraud, unjust enrichment, and section 17200 of the California Business & Professional Code – the same claims asserted by one of the class representatives in this case – because the plaintiff obtained a product that performed as expected and the fact that she would not have purchased it had she known the drug was adulterated did not support a claim.

- In *In re Bisphenol-A (BPA) Polycarbonate Plastic Products Liability Litigation*, 2011 WL 6740338, * 4 (W.D. Mo. Dec. 22, 2011), the district court held that a consumer who fully used the defendant's product without suffering adverse results could not assert claims under the Missouri Merchandising Practices Act or for breach of warranty.

---

[10] The Court has limited its survey to Missouri, California and New York because those are the states whose laws govern the class representatives' claims. The Court is not aware of any jurisdiction where the law would be different.

- Under Missouri law, the measure of damages for unjust enrichment is not simply the enrichment enjoyed by the defendant, but the amount of the enrichment that – as between the parties – it is unjust for the defendant to keep. *E.g.*, *Pitman v. City of Columbia*, 309 S.W.3d 395, 403 (Mo. Ct. App. 2010). Thus, the benefit enjoyed by the class members – the use of Roundup – becomes a factor to be considered. California and New York law are more explicit on this point. *E.g.*, *Meister v. Mensinger*, 203 Cal. App. 4th 381, 389 (2014); *Metal Cladding, Inc. v. Brassey*, 553 N.Y.S. 2d 255 (N.Y. App. Div. 1990).

In short: the class members' recovery was never going to be 100% of the purchase price. And, the Objector provides no compelling argument otherwise. She points to the relief sought in the Complaint, which included a request for full refunds, (*e.g.*, Doc. 74, p. 14), but the fact that Plaintiffs sought full refunds does not change the fact that the proper measure of damages did not permit full refunds.[11] Therefore, full refunds would constitute a windfall and the Court is not required to reject the settlement for failing to give the claimants a windfall.

Given that class members realized some use/value from Roundup, the appropriate measure for their damage would be the difference between what they bargained for and what they received. The parties commissioned experts to analyze the issue. Class Counsel's analysis suggested that the difference in value was approximately 8% to 16% of the purchase price. (*E.g.*, Doc. 50-1, ¶¶ 7-8; Doc. 74, p. 10.) Defendant's analysis suggested that the difference in value was

---

[11] At argument, the Objector also referred to a case from the Southern District of California decided in the last year and described it as holding that a plaintiff need not "claim that the product is valueless, just that you wouldn't have purchased it." (Doc. 74, p. 14.) However, no citation was provided, the Objector's written objections do not cite a case from the Southern District of California, and the Court is unable to ascertain the case to which she referred. If she was referring to *Kreger v. Wyeth, Inc.*, 396 F. Supp. 3d 931, 945 (S.D. Cal. 2019) or *Brannon v. Barlean's Organic Oils, LLC*, 2019 WL 4393653 *3 (S.D. Cal. Sep. 12, 2019), the issue addressed in those cases was whether an injury sufficient to demonstrate standing had been alleged; the issue was not the measure of damages. If she is referring to *Robinson v. OnStar, LLC*, 2020 WL 364221, *23 (S.D. Cal. 2020), the court there observed that "the full refund model depends on the assumption that not a single consumer received a single benefit from Defendant's" goods, (cleaned up), and is thus consistent with what the Court has discussed in the text.

approximately 2.5%. (*E.g.*, Doc. 50-4; Doc. 74, pp. 9-10.) And in response to the Court's question, the Objector did not profess to having any evidence on this issue. (Doc. 74, pp. 14-15.)[12]

Thus, based on the legal measure of damages, the Court concludes that claimants have already been compensated for more than they could have recovered. The Court does not reach this conclusion simply because the parties agreed that claimants would receive 50% of the purchase price (because, as stated, that would violate *BankAmerica*), but reaches this conclusion based on the claims and evidence presented. And, because the claimants have been fully (or more than fully) compensated, further distributions would constitute a windfall. Therefore, the use of a *cy pres to* distribute the unclaimed funds is permissible.

## 2.  The Cy Pres Recipients

The Eighth Circuit has "emphasize[d] the importance of tailoring a *cy pres* distribution to the nature of the underlying lawsuit." *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 683 (8th Cir. 2002). The "distribution must be for the next best use for indirect class benefit and for uses consistent with the nature of the underlying action and with the judicial function." *BankAmerica*, 775 F.3d at 1067. The Objector does not contend that the recipients in this case fail to satisfy these standards.[13]  Instead, she argues that the distribution constitutes compelled speech in violation of her First Amendment rights. She reasons that because the settlement funds belong to the class members, and contributions to charities constitute speech, distributing the money

---

[12] The Court concedes the possibility that there may have been class members who (1) purchased Roundup, then (2) learned the truth regarding the Label's representations, then (3) based on that truth elected not to use any of the product they purchased, and that any such members may be able to argue that their damages exceed 50% of the purchase price. There is no suggestion that any, much less many, such class members exist, and the Court does not believe that this speculative possibility should be a factor in the analysis.

[13] *BankAmerica* discussed the need to allow class members to suggest alternative *cy pres* recipients. *BankAmerica*, 775 F.3d at 1066. However, (1) *BankAmerica* involved a *cy pres* that was court-mandated, not settlement-mandated, and as previously discussed the Court cannot rewrite the settlement, (2) class members were told who the recipients would be, and (3) no class member – including the Objector – proposed alternative recipients.

14

through a *cy pres* to a charity infringes on each and every class member's rights unless each of them consents to the recipient. (Doc. 71, pp. 17-18.) The Court rejects this argument and overrules the objection.

First, in this context, the fact that the *cy pres* is created by the private agreement of the parties is significant, because it is that agreement – and not government compulsion – that effectuates the *cy pres*. Therefore, the First Amendment is not implicated. *In re Motor Fuel Temperature Sales Practices Litig.*, 872 F.3d 1094, 1113-14 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 1299 (2018).[14] The Objector cites cases observing that the settlement approval process implicates the class members' rights, (Doc. 71, p. 19 n.4), but while this observation is true in a general sense it does not further the First Amendment argument the Objector presents. In fact, she cites no authority (other than cases about compelled speech in other contexts) to support her novel argument.

Second, while the settlement fund belongs to the class as a whole, it cannot fairly be said that the remainder belongs to any one member. Having concluded that each member has been fully compensated from the fund, it is not clear that any member has a valid "claim" to the remainder such that any portion of it is the property of any single class member. While it may be said to belong to the class collectively, this does not mean that a single class member can exercise veto power over its disposition. And, here, only the Objector has asserted qualms about the *cy pres* recipients (although, as noted in footnote 14 above, the Objector does not suggest an alternative that she prefers).

Certainly, if there were a significant number of objections the Court would be obligated to consider them. But here, there is just one objection. The Court does not believe the Objector (or

---

[14] This should not imply anything about the Court's views regarding a court-imposed *cy pres* because that is not the issue before the Court.

15

any single class member) has a First Amendment right that permits them to compel rejection of the settlement.

### D. Attorney Fees

When considering a fee request in a class action settlement, the Court may utilize either a lodestar approach or a percentage of the benefit approach. The former approach considers the reasonable amount of hours billed by Class Counsel and the reasonable hourly rate; the latter approach "permits an award of fees that is equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation." *Keil*, 862 F.3d at 701 (quotation omitted). The choice of which to use is discretionary. *Id.* The Court can also consider the relevant factors from the Fifth Circuit's decision in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974). *See, e.g., Rawa*, 934 F.3d at 870; *Keil*, 862 F.3d at 701. Some of those factors are largely subsumed within the lodestar analysis (such as the time and labor required and the experience, reputation and ability of the attorneys). However, some of the factors relevant to this case include (1) the novelty and difficulty of the questions, (2) the amount of money involved, and (3) the results obtained,

Here, Class Counsel seeks an award of 25% of the settlement fund for fees and costs, which equates to $9,887,500. This percentage is comfortably below the range frequently approved in class action settlements. *See Vogt v. State Farm Life Ins. Co.*, 2021 WL 247958, *2 (W.D. Mo. Jan. 25, 2021 (citing cases to establish that fees in the range of 33.3% and 36% are common); *see also Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017) (describing an award of 38% as "on the high end of the typical range."). Notwithstanding the Objector's arguments, the Court approves the request for attorney fees and costs totaling $9,887,500.

16

The Objector first suggests that the Court should not consider the amount distributed through the *cy pres* to be part of the common fund because that amount is not benefitting the class. If the *cy pres* is disregarded, the amount requested by Class Counsel is between 39% and 42% of the fund.[15] But there is no authority requiring that the *cy pres* amount be disregarded in the attorney fee calculation.[16] As the Third Circuit said (in one of the cases the Objector relies on):

> We think it unwise to impose . . . a rule requiring district courts to discount attorneys' fees when a portion of an award will be distributed *cy pres*. There are a variety of reasons that settlement funds may remain even after an exhaustive claims process—including if the class members' individual damages are simply too small to motivate them to submit claims. Class counsel should not be penalized for these or other legitimate reasons unrelated to the quality of representation they provided. Nor do we want to discourage counsel from filing class actions in cases where few claims are likely to be made but the deterrent effect of the class action is equally valuable.

*In re Baby Prod. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013).[17]

Relatedly, it is not correct that the *cy pres* is of no benefit to the class; it is not a direct benefit in that it does not put money in the class members' pockets, but the very notion of a *cy pres* is that it is "as near as possible" to a direct benefit as can be achieved.[18] Even if the "lack of

---

[15] The percentage is a range because the claims administration process is not quite finished, so the final amount paid to all claimants is not yet known. The Court's calculations include the administrative costs as part of the benefit to the class, as permitted by *In re Life Time Fitness, Inc., Telephone Consumer Protection Act Litigation*, 847 F.3d 619, 623 (8th Cir. 2017).

[16] The Objector cites to several cases holding that fees can be adjusted based on the degree of success, such as *Galloway v. Kansas City Landsmen, LLC*, 833 F.3d 969, 975 (8th Cir. 2016), but (1) those cases do not address what role a *cy pres* has in considering "success" and (2) as discussed previously, the claimants in this case received as much if not more than they could have expected to receive.

[17] The Third Circuit also declared that "[w]here a district court has reason to believe that counsel has not met its responsibility to seek an award that adequately prioritizes direct benefit to the class, we therefore think it appropriate for the court to decrease the fee award." *In re Baby Prod. Antitrust Litig.*, 708 F.3d at 178. But the Court does not have that belief in this case.

[18] The Court acknowledges that the Seventh Circuit has held otherwise. *See Pearson v. NBTY, Inc.*, 772 F.3d 778, 781-82 (7th Cir. 2014). But the Seventh Circuit takes a stricter view on the subject overall than does the Eighth Circuit, as demonstrated by the fact that the Seventh Circuit does not allow consideration of the costs when determining the reasonableness of the fee award. *Compare Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) *with In re Life Time Fitness, Inc., Telephone Consumer Protection Act Litigation*, 847 F.3d 619, 623 (8th Cir.

directness" justifies a 50% reduction in the "valuation" of the funds distributed through the *cy pres* (as suggested in *In re Heartland Payment Systems, Inc. Customer Data Security Breach Litigation*, 851 F. Supp. 2d 1040, 1077 (S.D. Tex. 2012) – another case cited by the Objector), the settlement fund's "adjusted value" would be, at the lowest, $32,315,000. The requested amount of $9,887,500 for fees and costs would be 30.6% of that adjusted value – which is within the acceptable range.[19]

The Court has also considered the injunctive relief. Contrary to the Objector's argument, the injunctive relief is not "illusory, unenforceable, and [of] no settlement value." (Doc. 71, p. 23 n.8.) This is not a case in which Defendant is simply ordered to follow the law. *See Galloway v. Kansas City Landsmen, LLC*, 833 F.3d 969, 974 n.3 (8th Cir. 2016) (addressing, and attaching no value to, an injunction stating "Defendants are hereby ordered to comply with the Fair and Accurate Credit Transaction Act . . . at all their currently owned locations."). Defendant must stop using the Label (after it obtains approval from the EPA to change the Label, as required by FIFRA). (Doc. 58-1, p. 10.) This means that Defendant must stop using a label that has already gone through the regulatory process and obtained EPA approval (and which therefore presumptively complies with the law). This also means that Defendant must incur the expense of going through the regulatory process again to obtain EPA approval for a new label. This is not illusory, unenforceable, or lacking in value. This is also relief that was not obtainable at trial, because injunctive relief requiring a change in the label would have been barred by FIFRA. That said, the Court does not endeavor to attach a monetary value to the injunctive relief so that it can be "added

---

2017); *see also Caligiuri v. Symantec Corp.*, 855 F.3d 860, 865 (8th Cir. 2017) (noting differences between the two Circuits' views).

[19] The Court has not calculated 25% of the "adjusted value" and instead kept the amount requested constant because this is what was disclosed to class members – that Class Counsel would seek up to 25% of the $39.55 million settlement fund.

18

to" the settlement fund to evaluate the fee request; however, "[t]he fact that counsel obtained injunctive relief in addition to monetary relief for their clients is . . . a relevant circumstance to consider in determining what percentage of the fund is reasonable as fees." *Staton v. Boeing Co.*, 327 F.3d 938, 946 (9th Cir. 2003).[20]

Finally, the Court has opted to consider the attorneys' billing records. *See Keil*, 862 F.3d at 701 (A District Court may, but is not required to, "verif[y] the reasonableness of its award by cross-checking it against the lodestar method."). The Court has done so not to determine with precision what the lodestar would be, but rather as check to further evaluate the reasonableness of amount requested. Those records reflect that in this case more than 1,265 hours were billed at rates that would generate nearly $782,000 in fees. In addition, the Court believes it appropriate to consider the billing records from *Blitz*, because (as will be discussed further below) a significant amount of work developing the factual and legal arguments in that case carried over to this one, thereby decreasing the amount of attorney time that had to be expended. In *Blitz*, more than nearly 1,900 hours were billed for a total of nearly $1.2 million.

Combined, more than 3,100 hours of work was devoted to this matter, which generated fees of slightly more than $1.97 million. The percentage of the fund Class Counsel requests is approximately five times this amount. However, there need not be an absolute correspondence between the percentage of the fund and the lodestar because the Court can adjust the lodestar based on the "individual characteristics of a given action." *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 865 (8th Cir. 2017) (quotation omitted). The Court finds this multiple of the lodestar is reasonable

---

[20] The Objector cites *Staton* to support its contention that the injunctive relief has no settlement value. (Doc. 71, p. 23 n.8.) The Ninth Circuit held that undifferentiated equitable relief "should generally be excluded from the value of a common fund when calculating the appropriate attorneys' fees award, as the benefit of that relief to the class members is most often not sufficiently measurable." *Staton*, 327 F.3d at 945-46. But as the quote in the text demonstrates, *Staton* did not hold that such injunctive relief is completely irrelevant to the analysis; it only held that the Court should not attempt to attach a monetary value to undifferentiated equitable relief.

for several reasons: courts in this Circuit have approved fees as high as 5.6 times the lodestar, *see id*. at 866; the complexity of the legal issues justifies a higher award; the results for claimants were excellent and very likely more than they could have achieved had the case gone to trial; the percentage of the fund sought, 25%, is in the low range of percentages typically sought; and the award is meant not just to compensate for the attorneys' fees but also to reimburse them for their costs – a factor not included in the lodestar.

The Objector argues that the lodestar confirms the *un*reasonableness of the amount sought by Plaintiffs' counsel. Many of her arguments would be relevant if the Court was attempting to calculate the lodestar with precision – which, as stated above, is not the Court's objective. The Court will not address all the points raised by the Objector, but it has considered them all and nonetheless finds the guidance provided by the lodestar supports the fee award.

First, some of the attorneys in this case billed at an hourly rate of $750/hour or $800/hour, and the Court rejects the Objector's suggestion that the lodestar had to utilize hourly rates that were no greater than approximately $450/hour. (Doc. 81, p. 12.) In terms of subject matter and scope, this was not a routine or typical class action, and the Court is not persuaded by the Objector's authorities that attorneys in Kansas City with the skill and experience to litigate this particular case would have charged $450/hour, primarily because the Objector's materials are very general. Moreover, the Court can rely on its own experience and knowledge of prevailing market rates to determine a reasonable hourly rate, *e.g., Brewington v. Keener,* 902 F.3d 796, 805 (8th Cir. 2018), and the Court has approved hourly rates exceeding $500/hour for more routine, non-class cases. If the Court opted to award fees based on the lodestar it would not limit the hourly rate in the manner the Objector suggests.

20

The Objector also contends the Court should not consider the work expended in *Blitz* but in the unique circumstances of this case the Court believes it is appropriate. The Objector cites several cases for the proposition that work performed in completely separate litigation usually is not compensable in subsequent case. But this is not the usual case, *Blitz* was not completely separate litigation, and unlike the judges in the cases the Objector cites the Court is persuaded by the facts in *this* litigation that consideration of Class Counsel's work in *Blitz* is appropriate. *Blitz* was intended to be a nationwide class just as this case, so at the outset the "parties" were the same. The plaintiffs who remained in *Blitz* (including those in the putative Wisconsin-only class) are members of the class in this case. The parties agreed that the discovery in *Blitz* would be used in this case, which is important because there were many depositions and significant exchanges of documents that did not have to be (and were not) repeated in this case. There were also significant legal issues briefed in *Blitz* (notably including the effect of FIFRA on Plaintiff's claims and the sufficiency of the allegations of falsity and deception) that did not have to be explored as deeply when Defendant raised the arguments again in this case. Ignoring these facts essentially allows the class in this case to reap the benefits of the work done in *Blitz* free of charge. In reality this case is a continuation of *Blitz*.

For these reasons, the Court finds an award of fees and costs totaling $9,887,500 is reasonable.

### III. CONCLUSION

The Motion for Final Approval of Class Settlement, (Doc. 65), is **GRANTED**. The Class is finally **CERTIFIED**, and this Court finally **APPROVES** the Updated Settlement and Plaintiffs' requested attorneys' fees award, expenses, and class representative awards.

21

It is further **ORDERED** that the Parties and the Claims Administrator shall implement the

Updated Settlement in accordance with its terms.

**IT IS SO ORDERED.**


      /s/ Beth Phillips
      BETH PHILLIPS, CHIEF JUDGE
DATE: May 13, 2021      UNITED STATES DISTRICT COURT